LokinCt, J.,
delivered the opinion of the court:
It was contended in behalf of the United States that this action was barred by the Act February 26,1853, (10 Stat. L., p. 170,) which avoids all assignments of claims against the United States made before a warrant for their payment has been issued at the Treasury Department; and that to take the case out of the statute it must be shown that the assignments were made *284 according to the general order of the War Department No. 305.
As early as 1835, in the case of The United States v. Robeson, (9 Peters, 319,) the Supreme Court said: “ There is no law of Congress authorizing the assignment of claims against the United States; and it is presumed, if such assignment is sanctioned by the Treasury Department, it is only viewed as an authority to receive the money, and not as vesting in the assignee any legal right.”
This decision was but a corollary of the common-law principle that a chose in action was, from its nature, unassignable. The courts of common law, under the compulsion of the growing-exigencies of trade and commerce, had derogated from this principle so far as to protect the interest of assignees of money demands by authorizing them to sue for them in the names of the assignors, and thus vested in such assignees a legal'right to the demand as against the assignor and against his debtor after notice. But the practice of courts could not control their governments nor trench upon their rights without their authority, and, therefore, in the absence of any act of Congress for the purpose, claims against the Uuited States remained unassignable in their nature; and, moreover, the United States were not suable at all, and the only reliance of an assignee of a claim against the United States was on such consideration as he might receive from the Secretary of the Treasury, and his only power was to treat the assignee as the agent of the assignor, receiving the money for him and in his right.
Subsequently the act of 1846 (9 Stat. L., p. 41) was passed. This was confined to claims against the United States allowed and ordered to be paid by a resolution or act of Congress; and it prohibited payment of such claims to any but the claimants, their executors or administrators, unless upon a warrant of attorney executed by the claimant, or his executor or administrator, duly attested and acknowledged, and made after the enactment of the resolution or act of 'Congress.
And under this act the payment of the claims specified in it was confined to the original claimants or their legal representatives, or their attorneys who, in name and in fact, represented the original claimants or their legal representatives, and received the money as for them, and without recognition of any rights of their own as assignees.
*285 But tbe stringent provisions of this statute proved insufficient for the protection of the United States, and then the act of 1853 was i>assed, declaring all assignments of claims against the United States absolutely void, except of claims which had been examined at the Treasury and adjusted there and a warrant issued for their payment. This act legalized the assignment of warrants for payment and nothing more, and such assignments are the only assignments which now are or since tbe act have been cognizable at the Treasury Department.
And the reason of the acts above specified was, that when they were enacted there was no tribunal before which the validity of assigned debts and of assignments could be examined and judicially determined, for the Treasury Department was not intended for or adapted to litigation. But this reason ceased when this court was established, and, therefore, in the acts establishing and reconstructing this court, the litigation of assigned claims was expressly provided for. And thus claims against the United States were removed from the fetters of the common law and made assignable in their nature by acts of Congress, and this assignee stands here, not as representing the assignor, or on a mere equity, but in his own legal right, and in his own name claiming his property.
But it was contended by the United States that the petitioner can claim only under and according to the general order of the War Department No. 305, under which the deposits were made and Avhich binds them as a contract.
And the sixth article of that order provides as follows: “ When a soldier desires to assign his money or any part of it to his family or other person, he shall give an order in duplicate on the paymaster for the amount, and the paymaster shall then pay the amount according to the order. The order shall be witnessed and certified as genuine by the commanding officer of the rendezvous, or the officer specially charged with that duty. The paymaster will issue his check on his depository, payable to the order of the assignee, and himself deliver or mail it direct to the assignee, in no case permitting it to fall into the hands of the soldier.”
It was not shown or claimed that the assignments under which the petitioner claims were made according to these provisions of the sixth article. And there was no need that they should be, for they are not within its purpose or operation.
*286 The reasons of order No. 305, requiring recruits at their draft rendezvous to deliver up all their money over $20, were the protection of their funds and the prevention of their misuse in dissipation at the rendezvous, where many men would be gathered together and the means of preventing disorder might be insufficient.
And the sixth article refers only to assignments made at the draft rendezvous. And this is clear, because the article requires that the assignment shall be witnessed and certified as genuine by the commanding officer of the rendezvous or the officer specially charged with that duty. And the sixth article refers to the reason above stated for requiring the deposit to be made at the draft rendezvous by its provision that the paymaster shall himself see that the check, he draws passes from him to the assignee, and is in no case permitted to fall into the hands of the soldier.
And it is equally clear that the assignments on which the petitioner claims were made and legally made within the provisions of the seventh article of the general order. That provides as follows: “After arriving at his regiment the soldier may claim payment of the amount of his deposit from the paymaster who pays his regiment, on the first regular payment being made him.” If it is his right then to claim and get it, it is because it is his property and then subject to his disposal and he may give it away or assign it. And the evidence shows that each soldier did assign his deposit to the petitioner for a vain-, able consideration, and it then became therefrom the property of the petitioner, beyond the control of the soldier and not to be affected by any subsequent act of his.
It was claimed for the United States in the argument that each soldier’s deposit was forfeited to the United States by his desertion, and the eighth article of the General Order No. 305 was relied upon. That article is as follows :
“ In case of death or discharge the money will be drawn from the Treasury in the same mode as other dues from the United States. In case of men charged with desertion, satisfactory proof must be produced of a removal of the charge, or that the soldier has served out his time and been properly discharged.”
But a soldier can be convicted of desertion only by the judgment of a court-martial, and the eighth article specifies and contemplates no such thing, but only “ a charge” of desertion. *287 And it cannot be inferred that a soldier is to forfeit his deposit upon a mere charge of desertion. And the article would appear to be merely directory to the Department for its action. And there is no law of Congress forfeiting a soldier’s deposit for his desertion, or authorizing the Department to do so. On the other hand, article 935, in the Army Eegulations of 1863, which provides for deposits of pay, expressly declares, in section 8, as follows: “ The money deposited by any soldier shall not be liable to forfeiture by sentence of court-martial.” And if the desertion of a soldier, adjudged by a court-martial, is not to forfeit his deposits of his pay, a fortiori a charge of desertion is not to forfeit his deposits of his property.
It was also contended for the United States that they were not liable to the petitioners unless they had agreed to hold for them the moneys deposited and assigned by the soldiers. And the case of the Bank of the Republic v. Millard, (10 Wall., 155,) and other cases cited, were relied upon. But, as was answered at the bar, those cases only decided that the holder of a bank-check, drawn by a customer of the bank, could not recover on it against the bank unless it had accepted the check, because the relation of a bank and its customer is not that of a depositor and depositary, but only that of debtor and creditor; while here the relation of the United States and the soldiers is that of depositary and depositors. Besides this, by the statutes of 1855 and 1863, authorizing suits here by assignees, the United States do agree with them to pay to them the claims assigned to them, on proof that such claims are due to them.
For the reasons stated we think that the petitioner is entitled to judgment.
It should be stated that in the return of the War Department it is stated that Harry Bradford deserted June 3, 1865, while his assignment to the petitioner is dated June 10,1865. But the assignment is attested by M. B. Campbell, who signs as second lieutenant of Bradford’s regiment, and a witness deposes that the officer and soldier signed their names in his presence on the 10th of June, 1865. And A. B. Nettleton, colonel of Bradford’s regiment, certifies on Bradford’s check-book that he reported for duty June 10. And on the evidence we think the conclusion is that the figure in ‘‘June 3” is a mistake for June 23.